**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SCOTT SEKULICH and KRISTIN SEKULICH, | |
| Plaintiffs, | Case No. 21-cv-04430 |
| v. | |
| MONSANTO COMPANY, | **COMPLAINT FOR DAMAGES** |
| Defendant. | **JURY DEMAND** |

## AMENDED COMPLAINT AT LAW

NOW COMES Plaintiffs, Scott Sekulich and Kristin Sekulich, by and through their attorneys, WISE MORRISSEY, LLC, and in their Amended Complaint at Law against Defendant Monsanto Company (hereinafter referred to as "Monsanto"), hereby state as follows:

## INTRODUCTION

1.     In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

2.     Since that time, Defendant Monsanto has marketed and sold Roundup®, its formulations, and derivative products, including, but not limited to: Roundup Quick-Pro, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready- to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass

1

Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate, hereinafter referred to collectively as, "Roundup®" and/or "Roundup."

3.      Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4.      Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Defendant Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5.      Defendant Monsanto's glyphosate products and glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been

found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world and it has traced the health implications from exposure to glyphosate since 2001.

7.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.     The IARC Working Group classified glyphosate as a Group 2A carcinogen, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

9.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

10.    More likely than not, glyphosate causes non-Hodgkin's lymphoma.

11.    More likely than not, glyphosate-based formulations cause non-Hodgkin's lymphoma.

12.    More likely than not, Roundup causes non-Hodgkin's lymphoma.

13.    Nevertheless, Defendant Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Defendant Monsanto has repeatedly

proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332(a)(1) as the parties in this action are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

15.     The Northern District of Illinois has personal jurisdiction over Defendant Monsanto because Defendant Monsanto is authorized to do business in Illinois and has sufficient minimum contacts within this judicial district, or otherwise intentionally avails itself of this judicial district's market so as to render the exercise of jurisdiction over it by this court consistent with traditional notions of fair play and substantial justice.

16.     Defendant Monsanto's minimum contacts within this judicial district are sufficiently related to Plaintiff's exposure, diagnosis, and claim in this matter to render personal jurisdiction in this judicial district proper.

17.     Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this judicial district/

18.      Specifically, Plaintiff's exposure to Defendant Monsanto's Roundup® product and resultant diagnosis with splenic non-Hodgkin's marginal zone lymphoma and later non-Hodgkin's diffuse large B-cell lymphoma.

## THE PARTIES

**Plaintiffs**

19.     Plaintiffs Scott Sekulich and Kristin Sekulich are currently citizens of the Village of Oak Park, County of Cook, State of Illinois.

20.      From approximately 1991 to 2006, Plaintiff Scott Sekulich worked as a caddy at Knollwood Club, a country club located at 1890 Knollwood Road in Lake Forest, Illinois 60045. Upon information and belief, he was exposed to Roundup® products that were regularly used on Knollwood Club's golf course during that time.

21.     In approximately October of 2015, Plaintiff Scott Sekulich, was diagnosed with Splenic Non-Hodgkin's Marginal Zone Lymphoma that subsequently transformed into Non-Hodgkin's Diffuse Large B-Cell Lymphoma.

22.     Plaintiff Kristin Sekulich is and at all times relevant to this complaint has been the lawfully wedded wife of Scott Sekulich and suffered injuries including but not limited to, loss of consortium.

**Defendant**

23.     Defendant Monsanto Company, Inc. is a Delaware corporation, Illinois Secretary of State ID No. 61261028, with its headquarters and principal place of business in St. Louis, Missouri, authorized to do business in the State of Illinois that conducted significant business within this judicial district at all times relevant herein.

24.     At all times relevant to this complaint, Defendant Monsanto discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

25.     Defendant Monsanto has regularly transacted and conducted business within this judicial district for years, and has derived substantial revenue from goods and products, including Roundup®, used in this judicial district during that same time.

26.     Defendant Monsanto expected or should have expected their acts to have consequences within the State of Illinois, and derived substantial revenue from interstate commerce.

27.     Upon information and belief, Defendant Monsanto did design, sell, advertise, manufacture, and/or distribute Roundup® with full knowledge of its dangerous and defective nature.

28.     Upon information and belief, in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

## FACTS COMMON TO ALL COUNTS

29.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

30.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

31.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Defendant Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Defendant Monsanto assured the public that Roundup® was harmless. In order to prove this, Defendant Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Defendant Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

**The Discovery of Glyphosate and Development of Roundup®**

32.     The herbicidal properties of glyphosate were discovered in 1970 by Defendant Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Defendant Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

**Registration of Herbicides under Federal Law**

33.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a)

34.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to

7

evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

35.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

36.    The EPA and the State of Illinois registered Roundup® for distribution, sale, and manufacture in the United States and the State of Illinois.

37.    FIFRA generally requires that the registrant, Defendant Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

38.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally- mandated process called "re-registration." 7 U.S.C. § 136a-

1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

39.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup**

40.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Defendant Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non- carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

41.     On two occasions, the EPA found that the laboratories hired by Defendant Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

42.     In the first instance, Defendant Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-based formulations, including nine of the 15 residue studies needed to register Roundup®.

43.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

44.     Three top executives of IBT were convicted of fraud in 1983.

45.     In the second incident of data falsification, Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

46.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Defendant Monsanto was marketing Roundup® in 115 countries.

**The Importance of Roundup® to Defendant Monsanto's Market Dominance Profits**

47.     The success of Roundup® was key to Defendant Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Defendant Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

48.     In response, Defendant Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to

glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Defendant Monsanto to expand its market for Roundup® even further; by 2000, Defendant Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Defendant Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

49.     Through a three-pronged strategy of increased production, decreased prices and by coupling Roundup® with Roundup Ready® seeds, Roundup® became Defendant Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Defendant Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Defendant Monsanto has known for decades that it falsely advertises the safety of Roundup®

50.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Defendant Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

> a.  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences …

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It stays where you apply it.

f. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

51. On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which Defendant Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-based pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. its glyphosate-based pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c. its glyphosate-based pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. its glyphosate-based pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e.   glyphosate-based pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f.   its glyphosate-based formulations or any component thereof might be classified as "practically non-toxic."

52.    Defendant Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

53.    In 2009, France's highest court ruled that Defendant Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Defendant Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

**Classifications and Assessments of Glyphosate**

54.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

55.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

56.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally,

at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

57.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

58.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

59.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

60.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and

municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

61.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

62.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

63.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

64.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

65.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

66.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

67.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

68. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

69. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

70. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self- administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings about Glyphosate's Dangers to Human Health**

71. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

Release Patterns

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to

the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

72.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-based herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known.

73.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is

promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

74.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

75.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

76.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

77.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

78.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

**Scott Sekulich's Exposure to Roundup®**

79.     Scott Sekulich worked as a caddy on the Knollwood Club golf course in Lake Forest, Illinois from approximately 1991 to 2006.

80.     Upon information and belief, Roundup® was regularly used on the Knollwood Club golf course between 1991 and 2006.

81.     As a result of his exposure to Roundup products, Scott Sekulich was diagnosed with splenic non-Hodgkin's marginal zone lymphoma in October of 2015, and then subsequently diagnosed with non-Hodgkin's diffuse large B-cell lymphoma.

## COUNT I
## STRICT LIABILITY (DESIGN DEFECT)
### (Scott v. Monsanto)

82.     Plaintiffs incorporates by reference each and every allegation set forth in paragraphs 1 through 81 as if fully stated herein.

83.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, users, and persons coming into contact with said products, including Scott Sekulich, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

84.     At all times relevant to this litigation, Defendant Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products to which Scott Sekulich was exposed, as described above.

85.     At the time Defendant Monsanto's Roundup products left its control, it was unsafe, defective, and unreasonably dangerous for use by or exposure to the public, and, in particular, Scott Sekulich, when used in the intended or reasonable foreseeable manner because it has a carcinogenic glyphosate-based formulation.

86.     Defendant Monsanto's Roundup® products were expected to and did reach the usual consumers, users, handlers, and persons coming into contact with said product, including

Scott Sekulich, without substantial change in the condition which it was designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

87.     Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of the Defendant Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

88.     Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of Defendant Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

89.     At all times relevant to this action, Defendant Monsanto knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant Monsanto, and suppressed this knowledge from the general public.

90.     Therefore, at all times relevant to this litigation, Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant Monsanto were defective in design and formulation, in one or more of the following ways:

   a.  When placed in the stream of commerce, Defendant Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

   b.  When placed in the stream of commerce, Defendant Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a

grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendant Monsanto's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendant Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-based formulations presents a risk of harmful side effects including without limitation causing non-Hodgkin's lymphoma, that outweigh any potential utility stemming from the use of the herbicide;

f. Defendant Monsanto knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g. Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products; and/or

h. Defendant Monsanto could have employed safer alternative designs and formulations.

91.     At all times relevant to this litigation, Scott Sekulich was exposed to the use of Defendant Monsanto's Roundup® products in an intended and reasonably foreseeable manner without knowledge of their dangerous characteristics.

92.     Scott Sekulich could not have reasonably discovered or perceived the defects and risks of Roundup® products herein mentioned before or at the time of exposure.

93.     The harm caused by Defendant Monsanto's Roundup® products, (i.e. non-Hodgkin's lymphoma), far outweighed their benefit, getting rid of weeds, rendering Defendant Monsanto's products dangerous to an extent beyond that which an ordinary consumer would contemplate.

94.     Defendant Monsanto's Roundup® products were and are more dangerous than alternative products and Defendant Monsanto could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant Monsanto designed its Roundup®

products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

95.     At the time Roundup® products left Defendant Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant Monsanto's herbicides.

96.     Scott Sekulich developed non-Hodgkin's lymphoma which caused him inter alia pain, suffering, disability, disfigurement, and loss of normal life as a result of using Monsanto's Roundup® products.

97.     The defects in Defendant Monsanto's Roundup® products were substantial and contributing factors in causing Scott Sekulich's grave and permanent injuries, including his non-Hodgkin's lymphoma, and, but for Defendant Monsanto's misconduct and omissions, Scott Sekulich would not have sustained his injuries.

98.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant Monsanto is strictly liable to Scott Sekulich.

99.     As a direct proximate result of Defendant Monsanto's wrongful acts and omissions, Scott Sekulich has suffered and continues to suffer pecuniary loss including without limitation injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; disability and disfigurement; loss of normal life; pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

WHEREFORE, plaintiff, Scott Sekulich, asks that a judgment be entered against the defendant, Monsanto Company, Inc., in a fair and just amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) plus costs and any further relief this court deems just.

## COUNT II
## STRICT LIABILITY (DESIGN DEFECT) – LOSS OF CONSORTIUM
### (Kristin v. Monsanto)

100.     Plaintiffs incorporates by reference each and every allegation set forth in paragraphs 1 through 81 as if fully stated herein.

101.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, users, and persons coming into contact with said products, including Scott Sekulich, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

102.     At all times relevant to this litigation, Defendant Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products to which Scott Sekulich was exposed, as described above.

103.     At the time Defendant Monsanto's Roundup products left its control, it was unsafe, defective, and unreasonably dangerous for use by or exposure to the public, and, in particular, Scott Sekulich, when used in the intended or reasonable foreseeable manner because it has a carcinogenic glyphosate-based formulation.

104.     Defendant Monsanto's Roundup® products were expected to and did reach the usual consumers, users, handlers, and persons coming into contact with said product, including Scott Sekulich, without substantial change in the condition which it was designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

105.     Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant

Monsanto were defective in design and formulation in that when they left the hands of the Defendant Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

106. Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of Defendant Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

107. At all times relevant to this action, Defendant Monsanto knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant Monsanto, and suppressed this knowledge from the general public.

108. Therefore, at all times relevant to this litigation, Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant Monsanto were defective in design and formulation, in one or more of the following ways:

    a. When placed in the stream of commerce, Defendant Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b. When placed in the stream of commerce, Defendant Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c. When placed in the stream of commerce, Defendant Monsanto's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d. Defendant Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-based formulations presents a risk of harmful side effects including without limitation causing non-Hodgkin's lymphoma, that outweigh any potential utility stemming from the use of the herbicide;

f. Defendant Monsanto knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g. Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products; and/or

h. Defendant Monsanto could have employed safer alternative designs and formulations.

109. At all times relevant to this litigation, Scott Sekulich was exposed to the use of Defendant Monsanto's Roundup® products in an intended and reasonably foreseeable manner without knowledge of their dangerous characteristics.

110. Scott Sekulich could not have reasonably discovered or perceived the defects and risks of Roundup® products herein mentioned before or at the time of exposure.

111. The harm caused by Defendant Monsanto's Roundup® products, (i.e. non-Hodgkin's lymphoma), far outweighed their benefit, getting rid of weeds, rendering Defendant Monsanto's products dangerous to an extent beyond that which an ordinary consumer would contemplate.

112. Defendant Monsanto's Roundup® products were and are more dangerous than alternative products and Defendant Monsanto could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

113. At the time Roundup® products left Defendant Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm

without substantially impairing the reasonably anticipated or intended function of Defendant Monsanto's herbicides.

114. Scott Sekulich developed non-Hodgkin's lymphoma which caused him inter alia pain, suffering, disability, disfigurement, and loss of normal life as a result of using Monsanto's Roundup® products.

115. The defects in Defendant Monsanto's Roundup® products were substantial and contributing factors in causing Scott Sekulich's grave and permanent injuries, including his non-Hodgkin's lymphoma, and, but for Defendant Monsanto's misconduct and omissions, Scott Sekulich would not have sustained his injuries.

116. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant Monsanto is strictly liable to Scott Sekulich.

117. As a direct proximate result of Defendant Monsanto's wrongful acts and omissions, Scott Sekulich has suffered and continues to suffer injuries of a personal and pecuniary nature.

118. At all times relevant to this litigation, the plaintiff, Kristin Sekulich, was the lawfully wedded wife of Scott Sekulich.

119. As a direct proximate result of Defendant Monsanto's wrongful acts and omissions, the plaintiff, Kristin Sekulich, suffered injuries including, but not limited to, loss of consortium.

WHEREFORE, plaintiff, Kristin Sekulich, asks that a judgment be entered against the defendant, Monsanto Company, Inc., in a fair and just amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) plus costs and any further relief this court deems just.

## COUNT III
## STRICT LIABILITY (FAILURE TO WARN)
### (Scott v. Monsanto)

120. Plaintiffs incorporates by reference each and every allegation set forth in paragraphs 1 through 81 as if fully stated herein.

121. At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and supplying Roundup® products, which are defective and unreasonably dangerous to consumers, users, and persons coming into contact with said products, including Scott Sekulich, when used in the intended or reasonably foreseeable manner, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant Monsanto.

122. Defendant Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to the public, including consumers and end-users, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-based formulations.

123. Defendant Monsanto's Roundup® products were expected to and did reach the usual consumers, users, handlers, and persons coming into contact with said product, including Scott Sekulich, without substantial change in the condition which it was designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

124. At all times relevant to this litigation, Defendant Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause the public, including but not limited to consumers, users, and persons coming into contact with said products, including Scott Sekulich, to suffer from

27

unreasonable and dangerous risks. Defendant Monsanto had a continuing duty to warn the public, including Scott Sekulich, of the dangers associated with Roundup® use and exposure. Defendant Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

125.    At the time Defendant Monsanto's Roundup products left its control, it was unsafe, defective, and unreasonably dangerous for use by or exposure to the public, and, in particular, Scott Sekulich, when used in their intended or reasonably foreseeable manner because it has a carcinogenic glyphosate-based formulation.

126.    At the time of manufacture, Defendant Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-based formulations because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

127.    At all times relevant to this litigation, Defendant Monsanto failed to investigate, study, test, or promote the safety of Roundup® products. Defendant also failed to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Scott Sekulich.

128.    Despite the fact that Defendant Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant Monsanto, or scientifically knowable to Defendant Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Scott Sekulich.

129.    Defendant Monsanto knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant Monsanto failed to adequately warn the public, including but not limited to consumers, users, and persons coming into contact with said products, of the risks of exposure to its products. Defendant Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

130.    At all times relevant to this litigation, Scott Sekulich was exposed to the use of Defendant Monsanto's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

131.    Scott Sekulich could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-based formulations prior to or at the time of Scott Sekulich's exposure due to this failure to warn. Scott Sekulich relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

132.    Defendant Monsanto knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

133.    The information that Defendant Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed, such as Scott Sekulich, to utilize the products safely and with adequate protection.

134.    Instead, Defendant Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

135.    To this day, Defendant Monsanto has failed to adequately and accurately warn of the true risks associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen, including the risk of non-Hodgkin's lymphoma.

136.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant Monsanto, were distributed by Defendant Monsanto, and when Scott Sekulich was exposed.

137.    Scott Sekulich developed non-Hodgkin's lymphoma which caused him inter alia pain, suffering, disability, disfigurement, and loss of normal life as a result of using Monsanto's Roundup products.

138.    Defendant Monsanto is liable to Scott Sekulich for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup®, glyphosate and glyphosate-based formulations.

139.    The defects in these Roundup® products were substantial and contributing factors in causing Scott Sekulich's injuries, and, but for Defendant Monsanto's misconduct and omissions, Scott Sekulich would not have sustained his injuries.

140.    Had Defendant Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Scott Sekulich could have avoided the risk of developing injuries as alleged herein.

141.    As a direct and proximate result of Defendant Monsanto placing its defective Roundup into the stream of commerce without appropriate warnings as further set forth above, Scott Sekulich has suffered and continues to suffer pecuniary loss including without limitation injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; disability and disfigurement; loss of normal life; pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

WHEREFORE, plaintiff, Scott Sekulich, asks that a judgment be entered against the defendant, Monsanto Company, Inc., in a fair and just amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) plus costs and any further relief this court deems just.

### COUNT IV
### STRICT LIABILITY (FAILURE TO WARN) – LOSS OF CONSORTIUM
### (Kristin v. Monsanto)

142.    Plaintiffs incorporates by reference each and every allegation set forth in paragraphs 1 through 81 as if fully stated herein.

143.    At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and supplying Roundup® products, which are defective and unreasonably dangerous to consumers, users, and persons coming into contact with said products, including Scott Sekulich, when used in the intended or reasonably foreseeable manner, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant Monsanto.

144.   Defendant Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to the public, including consumers and end-users, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-based formulations.

145.   Defendant Monsanto's Roundup® products were expected to and did reach the usual consumers, users, handlers, and persons coming into contact with said product, including Scott Sekulich, without substantial change in the condition which it was designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

146.   At all times relevant to this litigation, Defendant Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause the public, including but not limited to consumers, users, and persons coming into contact with said products, including Scott Sekulich, to suffer from unreasonable and dangerous risks. Defendant Monsanto had a continuing duty to warn the public, including Scott Sekulich, of the dangers associated with Roundup® use and exposure. Defendant Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

147.   At the time Defendant Monsanto's Roundup products left its control, it was unsafe, defective, and unreasonably dangerous for use by or exposure to the public, and, in particular, Scott Sekulich, when used in their intended or reasonably foreseeable manner because it has a carcinogenic glyphosate-based formulation.

148.    At the time of manufacture, Defendant Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-based formulations because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

149.    At all times relevant to this litigation, Defendant Monsanto failed to investigate, study, test, or promote the safety of Roundup® products.  Defendant also failed to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Scott Sekulich.

150.    Despite the fact that Defendant Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant Monsanto, or scientifically knowable to Defendant Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Scott Sekulich.

151.    Defendant Monsanto knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant Monsanto failed to adequately warn the public, including but not limited to consumers, users, and persons coming into contact with said products, of the risks of exposure to its products. Defendant Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

152.     At all times relevant to this litigation, Scott Sekulich was exposed to the use of Defendant Monsanto's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

153.     Scott Sekulich could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-based formulations prior to or at the time of Scott Sekulich's exposure due to this failure to warn. Scott Sekulich relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

154.     Defendant Monsanto knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

155.     The information that Defendant Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed, such as Scott Sekulich, to utilize the products safely and with adequate protection.

156.     Instead, Defendant Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

157.    To this day, Defendant Monsanto has failed to adequately and accurately warn of the true risks associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen, including the risk of non-Hodgkin's lymphoma.

158.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant Monsanto, were distributed by Defendant Monsanto, and when Scott Sekulich was exposed.

159.    Scott Sekulich developed non-Hodgkin's lymphoma which caused him inter alia pain, suffering, disability, disfigurement, and loss of normal life as a result of using Monsanto's Roundup products.

160.    Defendant Monsanto is liable to Scott Sekulich for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup®, glyphosate and glyphosate-based formulations.

161.    The defects in these Roundup® products were substantial and contributing factors in causing Scott Sekulich's injuries, and, but for Defendant Monsanto's misconduct and omissions, Scott Sekulich would not have sustained his injuries.

162.    Had Defendant Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Scott Sekulich could have avoided the risk of developing injuries as alleged herein.

163.    As a direct and proximate result of Defendant Monsanto placing its defective Roundup into the stream of commerce without appropriate warnings as further set forth above, Scott Sekulich has suffered and continues to suffer injuries of a personal and pecuniary nature.

164.    At all times relevant to this litigation, the plaintiff, Kristin Sekulich, was the lawfully wedded wife of Scott Sekulich.

165.    As a direct proximate result of Defendant Monsanto's wrongful acts and omissions, the plaintiff, Kristin Sekulich, suffered injuries including, but not limited to, loss of consortium.

WHEREFORE, plaintiff, Kristin Sekulich, asks that a judgment be entered against the defendant, Monsanto Company, Inc., in a fair and just amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) plus costs and any further relief this court deems just.

## COUNT V
## NEGLIGENCE
### (Scott v. Monsanto)

166.    Plaintiffs incorporates by reference each and every allegation set forth in paragraphs 1 through 81 as if fully stated herein.

167.    Defendant Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and promoted to the public.

168.    Defendant Monsanto, directly or indirectly, caused Scott Sekulich to be exposed to Roundup® products.

169.    At all times relevant to this litigation, Defendant Monsanto knew or reasonably should have known of the hazards and dangers of Roundup® products and specifically, the carcinogenic properties of the chemical glyphosate.

170.    At all times relevant to this litigation, Defendant Monsanto knew reasonably should have known that use of and/or exposure to its Roundup® products created a high risk of unreasonably dangerous side effects, including but not limited to non-Hodgkin's lymphoma.

171.    At all times relevant to this litigation, Defendant Monsanto also knew or reasonably should have known that the public, including users and consumers of Roundup®, were unaware

of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup®
and glyphosate-based formulations.

172.    At all times relevant to this litigation, Defendant Monsanto had a duty to exercise
reasonable care in the designing, researching, testing, manufacturing, marketing, supplying,
promoting, packaging, sale, and/or distribution of its Roundup® products into the stream of
commerce, including a duty to assure that the product was safe and would not cause unreasonable
harm to the public, consumers, users, or persons exposed, including Scott Sekulich

173.    Notwithstanding said duty, the defendant, Monsanto, committed one or more of the
following acts and/or omissions:

    a.  Promoted, developed, designed, sold, and/or distributed its Roundup® products
without thorough and adequate pre-and post-market testing;

    b.  Promoted, developed, designed, sold, and/or distributed Roundup® while
concealing and failing to disclose the results of trials, tests, and studies of exposure
to glyphosate, and, consequently, the risk of serious harm associated with human
use of and exposure to Roundup®;

    c.  Failed to undertake sufficient studies and conduct necessary tests to determine
whether or not Roundup® products and glyphosate-based formulations were safe
for their intended use in agriculture and horticulture;

    d.  Failed to use reasonable and prudent care in the design, research, manufacture, and
development of Roundup® products so as to avoid the risk of serious harm
associated with the prevalent use of Roundup®/glyphosate as an herbicide;

    e.  Failed to design and manufacture Roundup® products so as to ensure they were at
least as safe and effective as other herbicides on the market;

    f.  Failed to provide adequate instructions, guidelines, and safety precautions to those
persons who Defendant Monsanto could reasonably foresee would use and be
exposed to its Roundup® products;

    g.  Failed to disclose to Scott Sekulich, users/consumers, and the general public that
use of and exposure to Roundup® presented severe risks of cancer and other grave
illnesses;

    h.  Failed to warn Scott Sekulich, consumers, and the general public that the product's
risk of harm was unreasonable and that there were safer and effective alternative
herbicides available;

     i.   Systematically suppressed or downplayed contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-based formulations;

     j.   Represented that its Roundup® products were safe for their intended use when, in fact, Defendant Monsanto knew or should have known that the products were not safe for their intended purpose;

     k.   Declined to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

     l.   Advertised, marketed, and recommended the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

     m.   Continued to disseminate information to its consumers, which indicate or imply that Defendant Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and/or

     n.   Continued the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

174.   As a result of one or more of the above acts and/or omissions, Scott Sekulich developed non-Hodgkin's lymphoma.

175.   Defendant Monsanto knew and/or should have known that it was foreseeable that users and persons exposed, including Scott Sekulich would suffer injuries, including but not limited to non-Hodgkin's lymphoma, as a result of Defendant Monsanto's failure to exercise ordinary care.

176.   Scott Sekulich did not know the nature and extent of the injuries that could result from the intended or reasonably foreseeable use of and/or exposure to Roundup® or its active ingredient glyphosate.

177.   Defendant Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Scott Sekulich suffered and will continue to suffer, as described herein.

178.   As a direct and proximate result of Defendant Monsanto's acts and/or omissions, Scott Sekulich has suffered and continues to suffer pecuniary loss including without limitation

injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; disability and disfigurement; loss of normal life; pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

WHEREFORE, plaintiff, Scott Sekulich, asks that a judgment be entered against the defendant, Monsanto Company, Inc., in a fair and just amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) plus costs and any further relief this court deems just.

**COUNT VI**
**NEGLIGENCE – LOSS OF CONSORTIUM**
**(Kristin v. Monsanto)**

179.    Plaintiffs incorporates by reference each and every allegation set forth in paragraphs 1 through 81 as if fully stated herein.

180.    Defendant Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and promoted to the public.

181.    Defendant Monsanto, directly or indirectly, caused Scott Sekulich to be exposed to Roundup® products.

182.    At all times relevant to this litigation, Defendant Monsanto knew or reasonably should have known of the hazards and dangers of Roundup® products and specifically, the carcinogenic properties of the chemical glyphosate.

183.    At all times relevant to this litigation, Defendant Monsanto knew reasonably should have known that use of and/or exposure to its Roundup® products created a high risk of unreasonably dangerous side effects, including but not limited to non-Hodgkin's lymphoma.

184.    At all times relevant to this litigation, Defendant Monsanto also knew or reasonably should have known that the public, including users and consumers of Roundup®, were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-based formulations.

185.    At all times relevant to this litigation, Defendant Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of its Roundup® products into the stream of commerce, including a duty to assure that the product was safe and would not cause unreasonable harm to the public, consumers, users, or persons exposed, including Scott Sekulich

186.    Notwithstanding said duty, the defendant, Monsanto, committed one or more of the following acts and/or omissions:

a.  Promoted, developed, designed, sold, and/or distributed its Roundup® products without thorough and adequate pre-and post-market testing;

b.  Promoted, developed, designed, sold, and/or distributed Roundup® while concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failed to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-based formulations were safe for their intended use in agriculture and horticulture;

d.  Failed to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.  Failed to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failed to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g.  Failed to disclose to Scott Sekulich, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.  Failed to warn Scott Sekulich, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

i.  Systematically suppressed or downplayed contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-based formulations;

    j.   Represented that its Roundup® products were safe for their intended use when, in fact, Defendant Monsanto knew or should have known that the products were not safe for their intended purpose;

    k.   Declined to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

    l.   Advertised, marketed, and recommended the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

    m.   Continued to disseminate information to its consumers, which indicate or imply that Defendant Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and/or

    n.   Continued the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

187.    As a result of one or more of the above acts and/or omissions, Scott Sekulich developed non-Hodgkin's lymphoma.

188.    Defendant Monsanto knew and/or should have known that it was foreseeable that users and persons exposed, including Scott Sekulich would suffer injuries, including but not limited to non-Hodgkin's lymphoma, as a result of Defendant Monsanto's failure to exercise ordinary care.

189.    Scott Sekulich did not know the nature and extent of the injuries that could result from the intended or reasonably foreseeable use of and/or exposure to Roundup® or its active ingredient glyphosate.

190.    Defendant Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Scott Sekulich suffered and will continue to suffer, as described herein.

191.    As a direct and proximate result of Defendant Monsanto's acts and/or omissions, Scott Sekulich has suffered and continues to suffer injuries of a personal and pecuniary nature.

192.    At all times relevant to this litigation, the plaintiff, Kristin Sekulich, was the lawfully wedded wife of Scott Sekulich.

193. As a direct proximate result of Defendant Monsanto's wrongful acts and omissions, the plaintiff, Kristin Sekulich, suffered injuries including, but not limited to, loss of consortium.

WHEREFORE, plaintiff, Kristin Sekulich, asks that a judgment be entered against the defendant, Monsanto Company, Inc., in a fair and just amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) plus costs and any further relief this court deems just.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demands a trial by jury of all issues herein so triable.

Respectfully submitted,

By: _____

CHLOE J. SCHULTZ

Francis P. Morrissey
Chloe J. Schultz
**WISE MORRISSEY, LLC**
161 N. Clark Street, Ste 3250
Chicago, IL 60601
(312) 580-2040
(312) 580-2041
fpm@wisemorrissey.com
Bar Identification No.:  6216580
cjs@wisemorrissey.com
Bar Identification No.: 6327569
*Attorneys for Plaintiff*